Johnson, J.
The testator, Thomas Smith, is represented to have died in September, 1830, and the first ground of this motion' arises out of the following clause of his will, which is preceded by divers specific bequests, to wit: — “ I also give, devise and bequeath all the rest, residue and remainder of my estate, real and personal, of what nature and kind soever the same may be, to my sister Ann Purcell, for and during the term of her natural life; and from and immediately after her death, *136 over,” &c. At the time of his death, the testator owned and possessed a plantation and negroes, which passed under this clause of the will, but being indebted, the question is, whether the crop growing on the plantation at the death of the testator, is assets in the hands of the executor, or passed to the'defendant under the devise.
It is enacted by the Act of 1789, Pub. Laws, 494, that “if any person shall die after the first day of March in any year, the slaves of which he or she was possessed, whether held for life or absolutely, and who were employed in making a crop, shall be continued on the lands which were in the occupation of the deceased, until the crop is ^-finished, and then be delivered to those who have the right in them ; and such crop shall be assets in the executor or administrator’s hands, for the payment of debts, legacies and distribution,” the current expenses being paid out of it. The same clause of the act further provides, that “ emblements growing on the land, and which shall be severed before the last day of December, shall likewise be assets in the hands of the executor or administrator ; but that such as may be growing on the land at that day, or at the death of the testator, if that happen between the said last day of December, and the first day of March, shall pass with the lands;” and if any person shall rent or hire lands or slaves of a tenant for life, and such tenant for life dies, the person having such land and slaves, shall not be dispossessed, until the crop of that year is finished, he or she securing the payment of the rent or hire when due.
According to the common law, the annual productions of the soil growing at the death of the testator, went to the executor and not to the heir; and thus far our Act is in affirmance of the common law; but this rule did not sufficiently provide for the state of things existing here. In England, the executor had the same means of providing for the cultivation of the crop that the testator had, by hired laborers, over whom the testator had not the power of disposition. Here it is, for the most part, done by means of slaves belonging to the testator, which he may dispose of by will, and in case of intestacy, are distributable in the same manner as lands or chattels. If they were removed from the land after the crop was planted, and before it was finished, it would, in general, and especially on large plantations, be impossible to supply their places, and the crop would be lost. In cases of intestacy, without this Act there could be nothing to restrain the administrator from making immediate distribution of the personal estate to the destruction of the crop, and thus a fund might be lost to the distributees or creditors. The object of the legislature obviously was to guard against these consequences, by making it the duty of the executor or administrator to retain the slaves and lands until the crop was finished ; The estate ^ie ^anl^ an^ neg1'068 vests, as at common law, in the devisee or distributee, and the possession only is postponed by this Act. Regarding the provisions of this Act as merely arbitrary, it operates in cases of intestacy with perfect equality and for the benefit of all concerned ; by this means the growing crop is preserved, and is so much added to the general fund. The supposed injustice of applying it to a case of testacy disappears, when it is recollected that the testator may order it otherwise if he will. His power of disposition is unlimited, and the Act can only operate when he is silent, and doubtless many incon *137 veniences are remedied by it. The rule which it prescribes appears to me to be wise and salutary.
If the land had been devised to one, the slaves to another, and the beasts of the plough to a third, there could have been no doubt that the rule prescribed by the act should prevail; and I cannot perceive how the circumstance that the whole is devised to one, can vary it — the Act contains no such exception. The inference, that by the devise of the whole to one, the testator intended that she should also take the crop, would equally apply when it was to several; there would be the same facility in making distribution of the crop, as of the corpus of the estate. It will be perceived by reference to the last member of the clause of the Act above recited, that when lands or slaves are hired from a tenant for life, he shall retain them until the crop of that year is finished, “but shall secure the payment of the rent or hire, when dueand it has been contended, that under this provision, the executor or administrator shall pay rent and hire for lands and slaves retained by him under the first member of this section. But that is utterly inconsistent with the crop’s being assets in his hands, for the payment of debts or legacies. Besides that, it is most obvious that it was intended to provide for an entirely different case, the case of lands or slaves hired from a tenant for life— whilst the other was intended to provide generally for the ease of one dying possessed of lands and slaves in his own right, for both of which a perfect and entire system is provided, without the aid of the other.
*In a preceding clause of this will, the testator directs that his debts shall be paid out of “such moneys as may be due to me at the time of my death, in preference to any part of my estate or the income thereofand reliance, I observe, is placed on this, in aid of the intention of the testator, that Ann Purcell should take the growing crop, there being a fund set apart for the payment of debts. If I am right in supposing that the crop did not pass under the devise of the lands and negroes, it is wholly immaterial whether the fund set apart for the payment of debts was sufficient or not. If it was not, then the proceeds of the crop would go in aid of it; if it was, then it would be applicable to the payment of pecuniary legacies, and the remainder, if any, would sink into the residuum.
On the second ground, we concur with the Chancellor. The bequest to .Sarah Hutchinson is of “five hundred dollars’ annuity to be paid her out of the income of my estate, on the first day of March in every year.” The bequest could not take effect until the death of the testator He died in September, and the whole annuity would not be dqe until the September of the following year. But it was to be paid on the first of March in every year; and we think it comports best with the intention of the testator, that she should be paid on the first day of March next after his death, a proportion of the annuity equal to the time which had run after his death;
It is, therefore, ordered and decreed, that the decree of the Circuit Court be reformed according to the principles of this decree.
O’Neall and Harper, Js., concurred.
After the first decree, this case was again heard at Charleston in January, 1832, on. exceptions to the report of the Commissioner, on the *138 reference previously ordered. The following decree presents the only question then raised, and the facts connected with it.
*De Saussure, Chancellor.
A decree was formerly delivered in this case on some of the points in it. It was referred to the Commissioner to report on certain facts, out of which certain questions might arise. The Commissioner has made a report on which the questions anticipated have been argued. It appears briefly that the testator, the late Mr. Thomas Smith, by his last will and' testament duly executed, bequeathed $2000 to Mr. Horace Waring, and some other legacies to others. The rest and residue of his estate was bequeathed to his sister, Mrs. Purcell, during her life, with a remainder to Col. Morton Waring and family. Some very short time before his death, the testator stated to his sister (as she testifies) that he had thought he had given a legacy of $5000 to Dr. Horace Waring, but on recurring to his will he found he had bequeathed only $2000; that he wanted to alter his will and give him $5000. He died suddenly within a few weeks of that conversation. In his coat pocket was found a bond on Mr. W. S. Smith, which it was believed he intended to deliver in part of such additional legacy. Mrs. Purcell, under such an impression, communicated her ideas to Col. Morton A. Waring, and proposed to him to deliver the bond to Dr. Horace Waring. To this Col. Waring did not object, and said he would not thwart any of the wishes of his testator. The bond was delivered with his knowlege and approbation to Dr. Waring. ' Col. Morton Waring was also sworn, who testified that the testator, Mr. Thomas Smith, had conversed with him about a legacy to Dr. Horace Waring, to the amount of $4000, but that in looking into the will he found he had given him but $2000, that it was his desire to double it, but was unwilling to alter his will. He stated that he had reason to believe that Horace was in a pecuniary difficulty, and the testator wished the additional provision to be immediately available and proposed a plan for that purpose; the plan was carried into effect, and the witness, Col. Waring, afterwards heard that stock was transferred to Dr. Horace Waring, to about the amount of $2000. Col. Waring states that he never, before the death of Mr. Smith, had any intimation, from any quarter, that Mr. Smith intended Dr. Waring* a bounty or benefit of $5000. From the report and the evidence it is obvious that neither of these executors desire to defeat or thwart the expressed wishes of their testator and benefactor— they would not dishonor themselves by doing so, after his kindness to them. It is not necessary to go into the question, how far the claim of Dr. Horace Waring to this enlargement of his legacy, could be sustained under the declaration of the testator. Some very strong cases exist on the subject, but they need not be referred to. Dr. Horace Waring is not a party to these pleadings — the bond of Mr. W. S. Smith has been delivered to him by one executor, with the approbation of the other, and that cannot now be distributed. The bill is filed by Col. Waring, as executor, against Mrs. Purcell, as executrix, to have a settlement of the estate, as between themselves and those they represent. Col. Waring insists that the testator meant to give Dr. Horace Waring only $4000, and that the legacy of $2000 actually bequeathed under the will, with nearly $2000 paid from a bond sold for the purpose of enlarging that *139 legacy, made up the amount intended for Dr. Horace Waring; and that the bond of Wm. S. Smith ought to have been retained as assets of the estate, applicable to pay the debts, and for distribution among the legatees.
Holmes, for the appellant,
cited 2 Eq. Rep. 219.
To this there seems to be two objections. First, at all events Col. Waring had been present and assenting to the delivery of the bond of Wm. S. Smith to Dr. Horace Waring (who had refused to receive it without his assent). It is not for him to insist that his co-executor should bring into her account of the estate, a bond transferred with his approbation, especially as there are no creditors to be affected. Secondly, that it is sufficiently proved that Mr. Thomas Smith did intend to enlarge the legacy of $2000 (by gift or otherwise) to Dr. Waring, to the amount of $5000 The two respectable witnesses, each entitled to perfect credit from high character, do certainly differ in their statement of the amount intended for Horace Waring. The one states $4000, and the other $5000, as the sum intended by Mr. Smith. Each statement is affirmative, and each'entitled to *credit. The testator must have stated the one sum to the one, and the other sum to the other, and he seems to have acted on the largest sum, for he caused to be delivered to Dr. Waring the proceeds of a bond which he sold, which, with the actual legacy, amounted to nearly $4000, and then was preparing, as Mrs. Purcell believes, to deliver up the bond of Wm. S. Smith to Dr. Waring, when he was surprised and prevented by death. It appears to me there should be no feud in this case ; both parties are beneficiaries of Mr. Thomas Smith, both would abhor and repel the imputation of desiring to defeat his wishes — they have expressed that good feeling which must be acted on to its full extent.
It is therefore decreed, that the bond of Wm. S. Smith was property delivered by Mrs. Purcell, to Dr. H. Waring, with the approbation of Col. M. Waring, and that no account should be taken thereof in the settlement of the estate. Cdsts to be paid out of the estate.
From this decree the plaintiff appealed, on the ground that his Honor the Chancellor erred, in decreeing that the delivery of the bond to Horace Waring, under the circumstances as stated in the decree, was proper. •
Johnson, J.
The evidence on both sides establishes that the bond of W. S. Smith was delivered to Dr. Waring by the defendant, with the consent and approbation of the plaintiff, in the belief that they were doing what the testator intended to do, and would, in all probability, have done, if he had not died suddenly. The plaintiff has since discovered circumstances which induce him to believe that they had mistaken the wishes of the testator, and that he had done, in his lifetime, what they supposed he would have had done after 'his death. Suppose this to be true, that gives him no cause of complaint against the defendant. The act done was his own act, for he consented to and approved it; and as to her, he is concluded by the maxim, volunti non fit injuria.
If there be any liability, it must then devolve on Dr. Waring ; and it is not readily perceived how he can be *reponsible. He had no legal right to the bond, and the delivery to him was a voluntary *140 gift from these parties, who as executor and executrix and legatees, had a right to give ; and if a mistake should be alleged as a ground for setting it aside, there would be some difficulty in making proof of a mistake, in a voluntary gift. Besides, the defendant still maintains that there was no mistake, and that they did precisely what the testator intended to do ; so that, in point of proof, the odds is against the complainant.

The motion must therefore he dismissed,

O’Neall and Earle, Js., concurred.